# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 07-60-GMS |
| | ) | |
| DAVID HANCOCK, | ) | |
| | ) | |
| Defendant. | ) | |

## RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

AND NOW COMES the United States of America, by and through Colm F. Connolly, United States Attorney, and Robert F. Kravetz, Assistant United States Attorney, and files the following response to Defendant David Hancock's motion to suppress evidence (D.I. 70).

Defendant's motion raises the sole issue of whether Wilmington Police officers had probable cause to arrest him when he arrived at a predetermined meet location to purchase a kilogram of cocaine in a brokered transaction that had been arranged through a series of recorded phone calls between co-defendant Miguel Alcantera[1] and an undercover police officer posing as a drug dealer. An evidentiary hearing is required to resolve defendant's motion. Because the evidence to be developed at the hearing will show that probable cause existed to arrest defendant, the Court should deny the motion.

---

[1]On October 30, 2007, Alcantera pleaded guilty to conspiracy to possess with the intent to distribute 500 grams or more of cocaine. His sentencing hearing is pending.

## I.    BACKGROUND[2]

On April 10, 2007, Wilmington Police Officers executed a search warrant at the home of a suspected drug dealer ("the dealer") on 27th Street in Wilmington. The search was successful, yielding approximately 400 grams (14 ounces) of cocaine, $6,000 in United States currency, and the dealer's cellular telephone. The Wilmington Police Department retained custody of the evidence.

The next day, as Wilmington Police Detective Danny Silva was processing the evidence, the cell phone rang repeatedly. The "Caller ID" function of the phone showed that the incoming phone calls were from a contact named "Peru." Eventually, Silva answered the phone. The voice on the other end of the line, apparently unaware of what happened at the dealer's residence, believed that Silva was one of the dealer's "boys" who he had met previously.[3] Silva, a seasoned drug investigator who has prior undercover experience, played along. During the first conversation, the man – later identified as co-defendant Miguel Alcantera – expressed an interest in buying a kilogram of cocaine.

After the initial brief conversation, Silva retrieved a recording device to record possible future conversations. Beginning at approximately 4:45 pm, and continuing over the next six hours, Silva recorded eight phone conversations between himself and Alcantera. Over the course of the phone calls it became clear that Alcantera was brokering the deal for an additional party. For example, in the first recorded phone conversation, Alcantera told Silva that he was going to charge

---

[2]Because the defendant claims that the police lacked probable cause to make a warrantless arrest, an evidentiary hearing is necessary for the parties to present evidence concerning the facts and circumstances within the officers' knowledge at the time of the defendant's arrest. The following section sets forth the evidence the United States expects to be submitted at the hearing.

[3]All of the conversations were in Spanish. Silva, who was born and raised and Puerto Rico, speaks Spanish fluently.

2

"them" $24,000 for the kilogram – which he was buying for $22,000 – and keep $2,000 for himself. In the third recorded conversation, Silva and Alcantera discussed how Alcantera would bring the entire payment amount to Silva with the third party and then return later to retrieve $2,000 and an additional half-ounce of cocaine for himself. Later in the evening, Alcantera apparently became greedy and told Silva that he was going to charge the third party $25,000 so that he could make a $3,000 profit on the deal.

Throughout the conversations, Alcantera referred multiple times to the third party purchaser as "the black guy" or "the black dude." Alcantera further described the man as the "short one". He also relayed that the purchaser was going to come with him to the house because "[t]hey ain't gonna trust me with the money." Alcantera told Silva that the third party had been involved in a drug deal on a prior occasion, and, in discussing the payment procedures, he reminded Silva of "the way it happened last time."

At approximately 10:06 p.m., Silva called Alcantera. Alcantera told Silva that he was waiting for the purchaser on 25th Street, a couple of blocks away. Alcantera stated that he had just spoken with the purchaser, and that the purchaser was going to meet him in the next ten or fifteen minutes. He also told Silva that he and the purchaser would arrive in separate cars like "the last time". The two agreed that Alcantera would park in an alleyway on the side of the house, and that Alcantera, Silva, and the other man would then go inside to count the money and retrieve the drugs.

The final recorded conversation between Silva and Alcantera took place at 10:26 p.m. By that time, Silva and other Wilmington police officers had established surveillance around the dealer's residence. During the conversation, Alcantera told Silva "we're on our way" and said that "we're gonna be there in a couple of minutes." Silva told Alcantera to call him when he arrived.

3

Silva then removed the recording device from his phone and continued surveillance directly across the street from the dealer's residence. A few minutes later, Silva observed a Nissan Altima pull into the alleyway next to the house and a blue Chevrolet Trailblazer, driven by the defendant, park directly in front of the residence. Alcantera then called Silva for the final time to tell him that he had arrived. While Silva was on the phone with Alcantera, he observed Hancock exit his vehicle and walk in the direction of Alcantera's car. Silva then received word from another surveillance officer that he had observed Alcantera speaking on his cell phone.

Based upon this information, Silva gave the order for all units to converge and arrest both men. As officers approached Alcantera, he and defendant took off in opposite directions. When defendant proceeded in Detective Silva's direction, Silva drew his weapon and ordered defendant to the ground. Defendant was handcuffed and later searched incident to arrest. During that search, officers found $25,370 in cash in defendant's pockets in various denominations. At the police station, defendant agreed to speak with Det. Silva. Defendant told Det. Silva that he arrived at the dealer's house to buy a kilogram of cocaine for $25,000. He further said that Alcantera put the deal together, and that he had met Alcantera at a convenience store on the corner of 25th and Madison Streets prior to following Alcantera to the dealer's house.

On April 18, 2007, DEA Special Agent Mike Machak arrested defendant at his home pursuant to a federal criminal complaint. Following his arrest, defendant agreed to speak with Machak. During their conversation, defendant again admitted that he arrived at the dealer's house on April 11, 2007, to buy a kilogram of cocaine from Alcantera's source of supply for $25,000.[4]

---

[4]The defendant has not alleged that either of his statements were obtained in violation of *Miranda*; only that the statements are inadmissible as fruit of the poisonous tree resulting from the warrantless arrest.

## II.    DISCUSSION

A Court considering a defendant's claim that a law enforcement officer made an

unconstitutional warrantless arrest reviews the historical facts relied upon the officer at the time of

the arrest to determine whether, under the totality of the circumstances, the officer had probable

cause to arrest the defendant. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).   An officer is

permitted to make a warrantless arrest if "at the time of the arrest, the facts and circumstances

within the officer's knowledge are 'sufficient to warrant a prudent man in the believing that the

[suspect] had committed or was committing an offense.'" *United States v. Glasser*, 750 F.2d 1197,

1205 (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).   The probable cause standard is a "fluid

concept – turning on the assessment of probabilities in particular factual contexts – not readily, or

even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see*

*also Brinegar v. United States*, 338 U.S. 160, 176 (1949) (stating that probable cause is a "practical,

nontechnical conception").

The process undertaken by a law enforcement officer to determine whether probable cause

existed "must be seen and weighed not in terms of library analysis by scholars, but as understood by

those versed in the field of law enforcement." *Gates*, 462 U.S. at 231 (citing *United States v.*

*Cortez*, 449 U.S. 411, 418 (1981)).   For this reason, law enforcement officers may use their unique

training and experiences to draw reasonable inferences that a suspect has committed or is

committing illegal conduct. *See Ornelas v. United States,* 517 U.S. 690, 699 (1996) ("[A] police

officer views the facts through the lens of his police experience and expertise."); *see also United*

*States v. Robertson*, 305 F.3d 164, 168 (3d Cir. 2002) (stating that an officer's reliance on his

training and experience is indispensable to evaluating whether there exists reasonable suspicion);

5

*Glasser*, 750 F.2d at 1206 (noting that a DEA agent could consider his experience relating to drug smuggling practices in finding that there was probable cause to arrest a defendant who picked up a package containing drugs).

Based upon the facts that he learned from the search of the dealer's home, his recorded conversations with Alcantera, his surveillance, and his extensive drug investigative experience, Det. Silva had probable cause to arrest defendant late in the evening on April 19, 2008. The evidence presented at the suppression hearing will show that Det. Silva had in his possession the telephone of a known drug dealer, from whose home he had seized almost 400 grams of cocaine. Det. Silva used his specialized drug investigation skills to engage Alcantera in a series of ten phone conversations (eight of which were recorded) to set up the kilogram drug deal. From those conversations, Det. Silva learned that Alcantera was brokering the deal for a short, African-American male, who had been involved in a previous deal with the drug dealer.

Det. Silva also knew from the conversations the exact location and time frame in which the deal was set to occur, and the circumstances in which Alcantera and the third party would be arriving at the meeting. Silva and Alcantera agreed that the deal would take place at the dealer's house. At approximately 10:06 p.m., Alcantera told Silva that he had just spoken with "the man with the money" who would meet him several blocks away in approximately 10 to 15 minutes. He also told Silva during that conversation that the man would be driving a separate vehicle. At approximately 10:26 p.m., Alcantera called Silva back and told him "we're on our way" – thus reaffirming that he would be accompanied by a third party buyer and narrowing the time frame in which the deal would occur. Several minutes later, two vehicles arrived at the dealer's residence. Thus, contrary to defendant's assertion that he arrived on 28th Street well after the meeting was set

6

to occur, the actual recorded conversations between Silva and Alcantera confirm that defendant arrived precisely at the moment the deal was expected to take place.

Furthermore, surveillance at the scene confirmed that the defendant was present to meet with Alcantera to buy a kilogram of cocaine. In an earlier conversation, Alcantera told Silva that they would meet in the alleyway initially and then proceed inside the house for Silva to count the money and then distribute the kilogram of cocaine. Alcantera explained that the meeting would take place just "how it happened the last time." After the second vehicle arrived and parked on 28th Street, Det. Silva observed a short, African-American male leave his car and walk toward the arranged meet location in the alleyway. Det. Silva could reasonably infer from defendant's arrival and subsequent actions that he had arrived for a drug deal and did not just happen to be "in the general vicinity" of illegal activity.

Moreover, after defendant saw police officers converge on Alcantera, he took off in the opposite direction until Det. Silva ordered him to the ground. Defendant's flight following the police chase of Alcantera supplied an additional basis to arrest him. *See United States v. Laville*, 480 F.3d 187, 195 (3d Cir. 2007) ("It is 'well established that where police officers reasonably suspect that an individual may be engaged in criminal activity, and the individual deliberately takes flight when the officers attempt to stop and question him, the officers generally no longer have mere reasonable suspicion, but probable cause to arrest.'") (citations omitted).

Faced with an analogous factual situation, the United States Court of Appeals for the Eighth Circuit determined that a DEA agent had probable cause to arrest a third party who showed up to a predetermined meet location with a known drug broker. *United States v. Schaafsma*, 318 F.3d 718 (7th Cir. 2003). In *Schaafsma*, an ecstasy broker had several conversations with an undercover DEA

agent to buy 5,000 ecstasy pills. During the conversations, the broker told the agent that he had a "guy" – referring to the defendant – who was working on getting the money together for the deal. The broker and the agent agreed to meet at a restaurant to do the deal. *Id.* at 720. Agents set up surveillance and observed the broker arrive in the parking lot. The broker went inside the restaurant and met with the agent. The two then returned to the broker's car to count the money. Once outside, the broker told the agent that his "guy" was waiting in the lot and then pointed in the general direction of a blue Toyota where a man was sitting alone. After the agent counted the money, he gave a pre-arranged arrest signal. During the takedown, another agent observed the blue Toyota leaving the parking lot "quicker than usual, like in a hurry to get out of the parking lot." *Id.* at 721. At that point, agents stopped the car and arrested the defendant. *Id.* In finding that the agents had probable cause to arrest the defendant, the Court of Appeals relied upon several factors. First, during the negotiations it was clear that the broker was brokering the deal for another person supplying money. Second, the broker said during recorded conversations that his "guy" would be getting the drugs, and the agent learned during the actual meeting that the broker's "guy" was somewhere in the parking lot. Finally, the Court noted that, when the broker was arrested, the blue Toyota left the parking lot at an above-average rate of speed. *Id.* at 722.

Similarly, Det. Silva had probable cause in the present case that defendant was engaged in illegal conduct. The recorded conversations revealed that Alcantera was brokering the deal, which necessarily implies the existence of a third party. Alcantera gave a general physical description of the third party, which subsequent surveillance confirmed. Moreover, defendant followed Alcantera to the meet location, parked exactly where Alcantera said he would park, and was walking toward the assigned meet location when the police converged to make arrests. At that point, defendant tried

8

CRITICAL

to leave the scene. From all of this information, a reasonable officer could infer that defendant was not just an innocent bystander, but rather was the third party who showed up to participate in the scheduled drug deal.

Defendant argues that Det. Silva based his arrest solely on defendant's presence in the vicinity where a cocaine transaction was scheduled to take place. In support of this argument, defendant relies upon *United States v. Capers*, 685 F.2d 249 (8th Cir. 1982), in which the United States Court of Appeals for the Eighth Circuit noted the general proposition that a third party's presence in the company of a person the police have probable cause to arrest does not, standing alone, confer probable cause to arrest the third party. *See, generally, United States v. DiRe*, 332 U.S. 581 (1947); *but see Pringle*, 540 U.S. at 373-74. Defendant's argument, however, ignores the additional, particularized information in Det. Silva's possession tying defendant to illegal drug activity beyond his mere presence on 28th Street at the time of Alcantera's arrest – most significantly the known existence of a broker relationship and defendant's own actions corroborating that he was the third party arriving to buy cocaine. Moreover, Defendant's reliance on *Capers* is puzzling, particularly considering that the Eighth Circuit concluded the police had probable cause to arrest the defendant based upon additional facts that the police had learned prior to the defendant's arrival at a house containing a significant quantity of cocaine. *See Capers*, 685 F.2d at 251-52; *see also Schaafsma*, 318 F.3d at 722 (rejecting the defendant's argument that he was merely present at the scene of illegal activity by explaining that "the police had presence plus flight plus [the broker's] statements clearly indicating that someone in the lot was his 'guy' involved in the sale.").

Finally, defendant's focus on additional steps the police could have taken to arguably conclude beyond doubt that he was the purchasing party is misplaced. The probable cause process

9

"does not deal with hard certainties, but with probabilities." *Gates*, 462 U.S. at 231 (citing *United States v. Cortez*, 449 U.S. 411, 418 (1981)). As the Supreme Court has noted, "it is clear that 'only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.'" *Gates*, 462 U.S. at 235; *see also Pringle*, 540 U.S. at 371 (noting that probable cause cannot be defined precisely or quantified into percentages "because it deals with probabilities and depends on the totality of the circumstances"). The inquiry focuses on whether a reasonable officer, under the totality of the circumstances, would conclude that defendant committed an offense – not on additional steps that the officer could have taken to gain an arguably higher degree of certainty. Defendant's proposed standard fails to recognize that law enforcement must be given "fair leeway for enforcing the law in the community's protection." *Pringle*, 540 U.S. at 371. In this case, the information Det. Silva knew about the brokered drug transaction at the time it was scheduled to take place, as well as the information he corroborated through surveillance, was clearly sufficient to justify the defendant's warrantless arrest.[5]

---

[5] In any event, it is not unusual that Det. Silva did not know the defendant's name, or the make or model of the car he was driving, prior to making the arrest. *See, e.g., United States v. Stubbs*, 281 F.3d 109, 122 (3d Cir. 2002); *Glasser*, 750 F.2d at 1206. The issue is whether the facts that he did know gave rise to a reasonable inference that the defendant committed or was committing illegal activity.

## III.  CONCLUSION

For the foregoing reasons, the United States requests the Court to dismiss defendant's

motion to suppress evidence at the conclusion of an evidentiary hearing.

Respectfully submitted,

COLM F. CONNOLLY
United States Attorney


BY:  /s/ Robert F. Kravetz
Robert F. Kravetz
Assistant United States Attorney


Dated: August 8, 2008

11

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 07-60-GMS |
| | ) | |
| DAVID HANCOCK, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

AND NOW this _____ day of _____, after having

considered Defendant's Motion to Suppress Evidence (D.I. 70), the United States's Response

thereto, and the evidence submitted at the evidentiary hearing, the Court hereby DENIES

defendant's motion.

By the Court:   _____

Hon. Gregory M. Sleet
Chief United States District Judge