IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| v. | : | Criminal No. 07-60 GMS |
| DAVID HANCOCK and MIGUEL ALCANTARA, | : | |
| Defendants, | : | |

**MEMORANDUM**

## I. INTRODUCTION

On April 24, 2007, the Grand Jury for the District of Delaware indicted David Hancock ("Hancock") on one count of conspiracy to possess with the intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 846, and one count of attempted possession with the intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). Thereafter, Hancock filed a motion to suppress evidence, which the court denied on October 23, 2008. Hancock also filed an amended motion to suppress evidence and statements, which the court held in abeyance. On February 23, 2009, the court heard evidence on the amended motion to suppress and held a bench trial in the matter.[1] The court subsequently denied the defendant's amended motion to suppress. The court further directed the parties to file proposed findings of fact and conclusions of law. After having considered the testimony elicited during the trial and the arguments presented in the parties' submissions on the issues, the court concludes that the government did not prove the elements of the conspiracy offense charged in Count 1 beyond a

---

[1] Prior to conducting trial, Hancock, the government, and the court consented to and executed a waiver of jury trial.

reasonable doubt, and finds Hancock not guilty of that offense. The court further concludes that the government proved the elements of the attempt offense charged in Count 2 beyond a reasonable doubt, and finds Hancock guilty of that offense.

## II. FINDINGS OF FACT

During the course of the proceeding, the United States called five witnesses: Danny Silva ("Silva"), a police officer employed by the City of Wilmington Police Department (the "WPD"),[2] Mark McHugh ("McHugh"),[3] a special agent employed by the United States Drug Enforcement Administration (the "DEA"), Michael Machak ("Machak"), a special agent employed by the DEA, Steven Murphy ("Murphy"), a special agent employed by the DEA, and Carmen Herrera ("Herrera"),[4] an interpreter and translator. Hancock testified on his own behalf, and did not call any other witnesses. The following represents the court's essential findings of fact as required by Rule 23(c) of the Federal Rules of Criminal Procedure.

### A. The Negotiated Deal for a Kilogram of Cocaine

On April 10, 2007, Silva and other officers executed a lawful search at the residence of Luis Camacho ("Camacho"), also known as Raul, at 210 West 28th Street, Apartment 1, Wilmington, Delaware. (See Transcript of Bench Trial ("Tr.") at 143.) During the search, the officers found in

---

[2] At the time of Hancock's trial, Silva had been employed as a WPD detective in the Drug Organized Crime and Vice Unit for 7 years. (See Transcript of Bench Trial ("Tr.") at 140.)

[3] McHugh did not testify at the bench trial. Instead, he testified during the suppression hearing the court held immediately prior to the bench trial. Both the parties and the court agreed, however, that McHugh's testimony would be incorporated into the trial record to avoid repetition. (Tr. at 124-25.)

[4] The government called Herrera as a witness, because she made Spanish-to-English translations of tape-recorded phone calls between Silva and Hancock's co-defendant. Herrera testified regarding the processes and techniques she used to translate the tape recordings, and the authenticity of the transcribed translations. The court will not include Herrera's testimony in its findings of fact because it does not add any factual information to the record.

2

excess of one-half kilogram of cocaine, approximately 10 grams of heroin, and some United States currency. (Id.) Detective Silva also recovered a cell phone from Camacho, having the phone number 302-442-0916. (Id. at 143-44.)

On April 11, 2007, the phone that Silva seized from Camacho the previous day began ringing or vibrating repeatedly. (Id. at 144.) Silva looked at the little identification window of the phone and noticed that "Peru" was the caller's name. (Id.) Peru was calling from the phone number 302-543-2193. (Id. at 146.) Silva later identified "Peru" as Hancock's co-defendant Miguel Alcantara ("Alcantara"). (Id. at 145.)

Silva eventually answered the phone. (Id. at 144.) "[R]ight off the bat," Peru said to Silva in Spanish, "I need a kilo."[5] (Id. at 144-45.) Silva told Alcantara that he would call him right back. (Id. at 145.) Silva did this in order to obtain a recording device to record future conversations. (Id.)

Beginning at approximately 4:40 p.m., and continuing over the next 6 hours, Silva recorded 8 phone conversations between himself and Alcantara, during which Silva pretended to be one of Camacho's drug associates. (Id. at 146; Gov't Exs. 1-2.) Over the course of the phone calls, it became clear to Silva that Alcantara was brokering a deal for a kilogram of cocaine for a third party.[6] (Id. at 146, 149-52.) In the first recorded phone call, Alcantara told Silva that he was going to "charge them the 24[,000]" and keep $2,000 for himself. (Gov't Ex. 2, Call 1 at 2.) He also told Silva, "He's [the third party] gonna – he's gonna want to come like the last time," and described the third party as a short African American male. (Id. at 3; see Gov't Ex. 2, Call 5 at 1; Gov't Ex. 2, Call 7 at 3.) In the third recorded conversation, Silva and Alcantara discussed how Alcantara would bring

---

[5] Silva was raised in Puerto Rico and is fluent in the Spanish language. (Id. at 142-43.)

[6] During the second recorded conversation, Alcantara told Silva that the third party did not trust him with the money. At this point, Silva "knew that [Alcantara] was definitely the broker," and not the mastermind. (Id. at 152.)

3

the entire $24,000 to Silva with the third party, and then return later to retrieve $2,000 and a half-ounce of cocaine for himself. (Gov't Ex. 2, Call 3 at 5.) In the seventh recorded conversation, Alcantara was "waiting for the man with the money" to arrive. (Gov't Ex. 2, Call 7 at 1.) Alcantara also informed Silva that he was going to charge the third party $25,000 rather than $24,000 to increase his profit to $3,000. (Id. at 2, 5.)

Silva and Alcantara set up the deal to occur the evening of April 11, 2007. (Tr. at 156.) Alcantara agreed that he would meet Silva at Camacho's residence. Silva instructed Alcantara to park next to a green car in the alleyway when he arrived. (Gov't Ex. 2, Call 6 at 8.) Silva directed Alcantara to the green car, because he knew that Camacho had a green Ford Taurus from the search conducted the previous day. (Tr. at 157.)

At approximately 10:06 p.m., Silva called Alcantara to see if he was ready for the deal. (Id.; see Gov't Ex. 2, Call 7 at 1.) Alcantara told Silva that he was waiting for the third party on 25th and Jefferson Streets, a couple of blocks away. (Gov't Ex. 2, Call 7 at 1; Gov't Ex. 4.) Alcantara had just spoken with the third party, and the third party was going to meet him in the next 10 or 15 minutes. (Gov't Ex. 2, Call 7 at 2.) Alcantara also told Silva that he and the third party would arrive in separate vehicles. Alcantara would park in the alleyway on the side of the house, the third party would park on 28th Street, and the three men would go inside to count the money and retrieve the drugs. (Id. at 3-5.) Silva instructed Alcantara to call him when he got the money from the third party. (Id. at 5.)

After that phone call, Silva and other WPD officers set up surveillance in the area. (Tr. at 162.) The officers were positioned near and around Camacho's residence on 210 West 28th Street in Wilmington. (Id.) Silva parked his unmarked vehicle in front of 28th Street to have a clear view of what was going on in front of Camacho's house. (Id.)

4

At approximately 10:26 p.m., Alcantara called Silva and told him that he and the third party were on their way to the deal and would be driving down 28th Street (a one-way street) to the residence.[7] (Tr. at 164; Gov't Ex. 2, Call 8 at 1.) Silva then instructed Alcantara to call him when they arrived at the house. (Tr. at 164-65; Gov't Ex. 2, Call 8 at 1.) About 1 minute later, Alcantara called Silva, as he was passing Silva's undercover vehicle on 28th Street to turn into the alleyway. (Tr. at 166; Gov't Ex. 13 at 14; Gov't Ex. 15.) Silva was able to see Alcantara on his cell phone at the time he passed. (Tr. at 166.) Immediately behind Alcantara's vehicle, Silva observed a blue Chevy Trailblazer. (Id. at 167.) The Trailblazer parked directly in front of Camacho's residence, across the street from Silva's unmarked vehicle. (Id. at 167-68; Gov't Ex. 5.)

Silva observed a short black male wearing a black knit cap, black leather jacket, and blue jeans exit the Trailblazer. (Tr. at 168.) The male, whom Silva later identified as Hancock, walked past the residence and "commit[ted]"[8] himself into the driveway of 210 West 28th Street. (Id.) At that point in time, the officers positioned in the alleyway attempted to take Alcantara into custody, but Alcantara fled. (Id.) As Hancock turned into the driveway, Alcantara was running out. (Id.) Silva observed Hancock jump up, turn around, and trot eastbound on West 28th Street past his own vehicle. (Id. at 168-69.) As Hancock was trotting, Silva saw him "digging into his pockets like he [was] trying to reach for something." (Id. at 169.) Hancock then stopped directly in front of Silva's vehicle. (Id.) Silva lowered his window, drew his service weapon, and helped another officer place

---

[7] The only information that Silva received from Alcantara about the third party purchaser was that the purchaser was a short African American male. (Tr. at 174-75.)

[8] According to Silva, "committed" meant that Hancock had walked into the driveway itself. (Tr. at 168.)

5

Hancock under arrest.[9] (Id. at 169.)

After arresting Hancock, Silva searched him at the scene in front of 210 West 28th Street, and observed a large quantity of money inside Hancock's pockets. (Id. at 170.) Silva left the money inside Hancock's pockets and transported him to the police station. (Id.) Silva then searched Hancock again and recovered $25,370 in cash. (Id. at 37-39, 170-72.) Hancock admitted that the money belonged to him and signed a Notification of Forfeiture Form as confirmation. (Id. at 38-39; Gov't Ex. 10.)

The officers eventually apprehended Alcantara. (Tr. at 172.) Upon searching Alcantara incident to arrest, Silva seized the cellular telephone that Alcantara had used to contact him throughout the day. (Id. at 173; Gov't Ex. 9.)

At the police station, Hancock agreed to speak with Silva regarding his actions that evening. (Tr. at 35.) Hancock told Silva that he had parked in front of 210 West 28th Street that evening to purchase a kilogram of cocaine from Alcantara and Camacho. (Id. at 38.) Hancock knew Camacho and was able to identify Camacho from a photograph that Silva provided. (Id. at 38-39.) Hancock's statement was consistent with the information Alcantara provided about the third party buyer during the recorded phone conversations. (Gov't Ex. 2, Call 1 at 3; Call 3 at 3; Call 4 at 4; Call 7 at 3-5.)

Silva also talked to Hancock about the money he had on his person that evening. Hancock stated that he and his wife had been saving the $25,370, it was all of the money he had, and that he was going to buy a kilogram of cocaine with it. (Tr. at 39.) Silva processed the money and released Hancock. (Id. at 39-40.)

Silva contacted Machak the next morning to inquire about possible federal prosecution. (Id.

---

[9] Silva never observed Hancock offering money or showing money to anyone in the vicinity of 210 West 28th Street. (Id. at 190.) Silva, however, testified that no one was at the residence except Alcantara, Hancock, and "a whole bunch of police officers." (Id.)

6

at 41.) On April 19, 2007, Machak and McHugh arrested Hancock at his home pursuant to a federal criminal complaint. (Id. at 62, 104.) McHugh and Machak searched Hancock's residence and found $5,469 and 3 cell phones, one of which had a phone number of 302-275-5509.[10] (Id. at 72, 107-08; Gov't Ex. 11.) Following his arrest, Hancock agreed to speak with McHugh and Machak at the DEA offices. (Tr. at 73-74.) Silva also was present for a portion of the interview. (Id. at 74, 90, 112.) During the conversation, Hancock admitted that he arrived at Camacho's house on April 11, 2007 to purchase a kilogram of cocaine from Alcantara's source of supply for $25,000. (Id. at 42, 78, 113.) Hancock stated that he had known Alcantara since either 1996-1999 or 2001-2003. (Id. at 113-114.) He also restated that the money seized from him belonged to him. (Id. at 114.) Hancock further told Machak and McHugh that he had gotten back into "the business" because bills were piling up and his wife was pregnant. (Id.) Finally, he told Machak and McHugh that he was going to take the kilogram of cocaine home and "sit on it," because cocaine availability was down in Wilmington. (Id. at 115.)

Hancock took the stand and testified in his own defense about the events surrounding his arrests on April 11, 2007 and April 19, 2007. Regarding his April 11, 2007 arrest and subsequent interview with Silva, Hancock testified that he did not tell Silva that he was at 210 West 28th Street to purchase a kilogram of cocaine. (Id. at 228.) Hancock also testified that he did not make any statements to Silva about the money found in his pockets during the search incident to his arrest. (Id.)

Hancock also recalled being questioned by McHugh and Machak on April 19, 2007. (Id.)

---

[10] At trial, the government introduced a chart created by Machak that summarized the telephone calls between Silva and Alcantara, and Alcantara and Hancock's cell phone on April 11, 2007. (See Gov't Ex. 15.) According to the phone records, Alcantara placed several phone calls to Hancock's cell phone and several phone calls were placed from Hancock's cell phone to Alcantara between the hours of 7:15 p.m. and 8:47 p.m. (Id.; see also Gov't Exs. 12-14.)

According to Hancock, the interview began with McHugh asking him questions about 2 other situations. (Id. at 229.) Silva then came into the room and confronted Hancock, stating that Hancock was at 210 West 28th Street to buy a kilogram of cocaine. (Id.) Hancock denied Silva's accusation. (Id. at 229-30.) Silva left the room and McHugh and Machak continued the interview. (Id. at 230.)

After Silva left, Machak asked Hancock whether he was at Camacho's residence to buy a kilogram of cocaine. (Id.) According to Hancock, he again denied the accusation, but McHugh and Machak kept asking him questions about it, "like a coercion." (Id. at 230-31.) Hancock testified that he told McHugh and Machak that he didn't know anything about a kilogram, but was at 210 West 28th Street on April 11, 2007 to talk with Alcantara. (Id. at 231, 240.) He also denied telling McHugh and Machak that he was going to take the cocaine and sit on it because there was a drought. (Id.) Hancock agreed, however, that the $25,370 found in his pockets was his money. (Id. at 232.)

With respect to his work history, Hancock testified that, at the time of his arrest on April 11, 2007, he had not been working since November or December 2006. (Id. at 235.) When Hancock had been working, he made approximately $12 an hour working sporadically. (Id. at 235-36.) Hancock's wife made approximately $14 to $15 an hour, and the couple was supporting 4 children. (Id. at 236.)

### B. Murphy's Expert Testimony

The government called Murphy, a DEA agent since 2001, as an expert witness regarding the uses for 1 kilogram of cocaine. Murphy first testified regarding his knowledge of the wholesale and street value of cocaine in the State of Delaware. (Tr. at 210.) Murphy keeps track of the value

8

through debriefings of confidential sources and information from wiretaps or phone conversations, as well as the DEA Trends in Trafficking periodical published quarterly. (Id.) Murphy is also familiar with the quantity of cocaine typically taken by users. (Id. at 210-11.)

Although he was not an agent on the case, Murphy was familiar with the facts because he reviewed the reports made by the case agents and met with Silva. (Id. at 212.) According to Murphy, the price of cocaine purchased in Delaware varies, depending on how connected or close the purchaser is to the source of supply. (Id.) In April 2007, there was a cocaine drought in the Wilmington-Philadelphia area. (Id. at 213.) A "drought" meant that cocaine was not as readily available and the price was beginning to increase. (Id.) As a result, the various players in the drug scene began charging higher premiums for the cocaine they sold. (Id.)

Murphy also testified about different units of cocaine and the prices dealers and street level users paid for those units. (Id. at 214.) Specifically, Murphy testified about gram, eight-ball, and kilogram units. A gram of cocaine is what users commonly buy from street-corner dealers. (Id.) An eight-ball is the next level up, and would be purchased by a street level user. (Id.) A kilogram, on the other hand, is a wholesale amount, because someone who purchased a kilogram of cocaine would get between 5,000 and 10,000 personal doses out of that quantity. (Id.) According to Murphy, the largest amount of cocaine that a user purchases for personal consumption is an eight-ball or 3.5 grams, which yields 17-35 doses or lines and costs $200 to $350. (Id. at 214-15.) A kilogram sells for $20,000 to $28,000 at the wholesale level. (Id. at 215.) At the street level, however, a kilogram that was sold per eight-ball would sell for $57,000 to $100,000, while a kilogram that was sold per gram would sell for $100,000 to $150,000. (Id. at 215-16.) Murphy used the units gram, eight-ball, and kilogram to demonstrate the difference between a street-level dealer and somebody that is acquiring large quantities of cocaine in order to break it down into smaller amounts, but not street-

9

level amounts. (Id. at 216.)

Murphy further testified that, based on his experience as an agent and familiarity with the literature and prevailing quantities, the possession of a kilogram of cocaine is consistent with a distribution amount. (Id. at 217.) This is so because of the sheer quantity, the involvement that the purchaser has to have in the drug trade to be able to purchase that amount of cocaine, and the cost basis or money that the purchaser is going to make off of the cocaine. (Id.)

Finally, Murphy testified that brokers are typically used in deals that involve large quantities of drugs, including cocaine. (Id. at 218.) The broker is the conduit between the purchaser and source of supply, and the broker receives a cash cut based upon the quantity for which he or she brokers the deal. (Id. at 218-19.) The purchaser, however, usually is not aware of the cut that a broker receives because, at that point, the purchaser would become aware of the inflated price he or she is paying for the cocaine. (Id. at 219.)

## II. CONCLUSIONS OF LAW

As previously mentioned, on April 24, 2007, the grand jury for the District of Delaware charged the defendant with one count of conspiracy to possess with the intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 846, and one count of attempted possession with the intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).

### A. Count 1 - Conspiracy

In order to show that Hancock is guilty of conspiracy to possess with the intent to distribute 500 grams or more of cocaine, the government is required to prove the following 3 elements beyond a reasonable doubt: (1) that two or more persons agreed to possess with the intent to distribute a controlled substance, in this case, cocaine; (2) that the defendant was a party to or a member of that

10

agreement; and (3) that the defendant joined the agreement or conspiracy knowing of its objective to possess with the intent to distribute a controlled substance and intending to join together with at least one other alleged conspirator to achieve that objective. Third Circuit Model Jury Instruction § 6.21.846D; *United States v. Iglesias*, 535 F.3d 150, 156 (3d Cir. 2008). The government may prove these elements entirely by circumstantial evidence. *United States v. Gibbs*, 196 F.3d 188, 197 (3d Cir. 1999). The existence of a conspiracy "can be inferred from evidence of related facts and circumstances from which it appears as a reasonable and logical inference, that the activities of the participants . . . could not have been carried on except as the result of a preconceived scheme or common understanding." *Id.* (quoting *United States v. Kapp*, 781 F.2d 1008, 1010 (3d Cir. 1986)).

In order to prove that a conspiracy existed, the government must demonstrate "an agreement to commit some other crime beyond the crime constituted by the agreement itself." *Id.* Thus, "a simple buyer-seller relationship, without any prior or contemporaneous understanding beyond the sales agreement itself, is insufficient to establish that the buyer was a member of the seller's conspiracy." *Id.* (citing *United States v. McGlory*, 968 F.2d 309, 324-25 (3d Cir. 1992); *Kapp*, 781 F.2d at 1010). However, "even an occasional supplier (and by implication an occasional buyer for redistribution) can be shown to be a member of the conspiracy by evidence, direct or inferential, of knowledge that she or he was part of a larger operation." *United States v. Price*, 13 F.3d 711, 728 (3d Cir. 1994). That is, "in order to prove a defendant's membership in a conspiracy when that defendant has only been in a buyer-seller relationship with a member of the conspiracy, the government must prove both that the defendant purchased drugs from the conspiracy and that the defendant knew that the individual from whom he purchased the drugs was part of a larger drug operation." *Gibbs*, 190 F.3d at 194.

In the context of supplier and buyer, the Third Circuit has identified several non-exclusive

factors which may be relevant in determining whether a conspiracy has been demonstrated, including: (1) the length of the affiliation between the defendant and the conspiracy; (2) whether there is an established method of payment; (3) the extent to which transactions are standardized; (4) whether there is a demonstrated level of mutual trust; (5) whether the buyer's transactions involved large amounts of drugs; and (6) whether the buyer purchased his drugs on credit. *Gibbs*, 190 F.3d at 199.

In the present case, Hancock is charged with conspiring with Alcantara to possess with the intent to distribute 500 grams or more of cocaine. The court finds that the evidence submitted by the government does not prove beyond a reasonable doubt that Hancock entered into a conspiratorial agreement with Alcantara. The circumstances surrounding Hancock's attempted purchase of the kilogram of cocaine demonstrate that Hancock did not know that he was dealing with a larger drug operation when he arrived at Camacho's residence. First, the evidence adduced at trial does not demonstrate that the affiliation between Hancock and the alleged conspiracy was lengthy. At most, the recorded conversations between Alcantara and Silva establish that Hancock participated in 1 prior brokered deal with Alcantara and Hancock. (See Gov't Ex. 2, Call 7 at 4-5.) The court finds that 1 prior deal is not enough to show an extended affiliation.

Whether there is an established method of payment is a closer call. In the recorded phone conversations with Silva, Alcantara indicated that Hancock had paid for the cocaine in the prior transaction by cash. (See Gov't Ex. 2, Call 2 at 3.) Because the record indicates only 1 prior transaction, however, the court is unwilling to find an established method of payment. Nor can the court conclude that Hancock's transactions with Alcantara and Camacho are standardized, as there is a dearth of record evidence regarding this factor.

In addition, the court finds that there is no demonstrated level of mutual trust between the

alleged co-conspirators Alcantara and Hancock. During one of the recorded telephone conversations, Silva asked Alcantara whether the third party could give Alcantara the money instead of attending the deal. (See id. at 2.) Alcantara responded "[t]hey ain't gonna trust me with the money." (Id.) During another of the recorded conversations, Alcantara told Silva that he was going to give him the entire $24,000 and take his share later "so that it wouldn't look suspicious." (Gov't Ex. 2, Call 3 at 2, 5.) Thus, the court can infer from the record evidence that Hancock did not trust Alcantara and Camacho.

As to the quantity of drugs to be purchased, the court finds that Hancock intended to purchase a kilogram of cocaine, which is a large amount. This fact alone, however, does not demonstrate that Hancock knew that Alcantara and Camacho were part of a larger drug operation.

Finally, there is no record evidence showing that Hancock was to purchase his drugs from Camacho on credit. Indeed, the evidence presented establishes the contrary; that is, that Hancock was going to purchase the kilogram of cocaine with cash. Accordingly, considering all of the facts and evidence of the circumstances surrounding Hancock's attempted purchase of the kilogram of cocaine, the court concludes that the government did not prove beyond a reasonable doubt that Hancock knew that he was dealing with a larger drug operation when he attempted to purchase his cocaine from Camacho. As such, the court finds Hancock not guilty on Count 1.

### B. Count 2 - Attempted Possession with Intent to Distribute Cocaine

In order to show that Hancock is guilty of attempted possession with the intent to distribute cocaine, the government is required to prove the following two elements beyond a reasonable doubt: (1) that the defendant intended to commit the crime of possession with the intent to distribute 500 grams or more of cocaine; and (2) that the defendant performed an act constituting a substantial step toward the commission of possessing with the intent to distribute 500 grams or more of cocaine,

which strongly corroborates or confirms that the defendant intended to commit that crime. *United States v. Cruz-Jiminez*, 977 F.2d 95, 102 & n.10 (3d Cir. 1992); *see also United States v. Earp*, 84 Fed. Appx. 228 (3d Cir. 2004).[11]

In the present case, the government presented ample credible evidence that Hancock intended to commit the crime of possession with intent to distribute 500 grams or more of cocaine, as outlined in its briefing. (See D.I. 94 at 15-17.) The most important pieces of evidence proffered by the government, however, are Hancock's confessions. Indeed, Hancock admitted in two separate interviews with law enforcement officers that he arrived at 210 West 28th Street the evening of his arrest for the purpose of purchasing a kilogram of cocaine for $25,000 from Alcantara's source.[12] As previously discussed, Hancock testified that he did not make any confessions to Silva, McHugh,

---

[11] The Third Circuit follows the Model Penal Code in determining what the government is required to prove for a crime of attempt. *Earp*, 84 Fed. Appx. at 233. Thus:

> A person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, he . . . purposely does or omits to do anything that, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

*Cruz-Jiminez*, 977 F.2d at 102. Here, the underlying crime of possession with intent to distribute requires the government to prove: (1) that the defendant possessed a mixture or substance containing a controlled substance; (2) that the defendant possessed the controlled substance knowingly or intentionally; (3) that the defendant intended to distribute the controlled substance; (4) that the controlled substance was a mixture or substance containing cocaine; and (5) that the weight of the mixture or substance containing the controlled substance was 500 grams or more. *United States v. Lacy*, 446 F.3d 448, 454 (3d Cir. 2006).

[12] Moreover, in the context of the suppression hearing, the court held that Hancock's confessions were "knowing and voluntary." (Tr. at 124.) The court adopts that finding as a conclusion of law for purposes of this ruling.

or Machak. After listening to the testimony of the witnesses and observing their demeanor, the court concludes that Silva's, McHugh's, and Machak's accounts of the facts are credible, while Hancock's account of the facts lacks credibility. As such, Hancock's confession unequivocally proves his intent to commit the crime charged.

The large quantity of cocaine involved in the transaction further supports the court's conclusion regarding Hancock's intent. *United States v. Rodriguez*, 961 F.2d 1089, 1092 (3d Cir. 1992) ("When a defendant is found in possession of a sufficiently large quantity of drugs, an intent to distribute may logically be inferred from the quantity of drugs alone."); *see United States v. Watts*, 306 Fed. Appx. 805 (3d Cir. Jan. 20, 2009) (holding that evidence that the defendant possessed approximately one kilogram of cocaine was sufficient to support his conviction for possession with intent to distribute cocaine). As Murphy testified, a kilogram of cocaine could fetch high profits in the Wilmington area drug market. (See Tr. at 215-16.) Hancock also realized the potential for profit on the kilogram, as he told McHugh and Machak that he was going to "sit on" the cocaine as prices continued to rise during the cocaine drought. (Tr. at 115.)[13]

Having found that the government proved beyond a reasonable doubt that Hancock had the requisite intent, the court now turns to whether Hancock took a substantial step to commit the crime. In the Third Circuit, a substantial step is "more than mere preparation," but less than "the last act necessary for the actual commission of the substantive crime." *Earp*, 84 Fed. Appx. at 234 (quoting *United States v. Yousef*, 327 F.3d 56, 134 (2d Cir. 2003)) (internal citations omitted). In the present case, the government adduced the following evidence: (1) Alcantara called Silva to broker a deal for a kilogram of cocaine; (2) during the course of Alcantara's conversations with Silva, he noted that

---

[13] The court finds Hancock's argument that he intended to personally consume the kilogram of cocaine, rather than sell it for a profit, not credible.

the third party purchaser was a short African-American male; (3) Hancock had telephone contact with Alcantara the night of the purchase; and (4) Hancock showed up at the agreed-upon meeting place – 210 West 28th Street – on the agreed-upon date – April 10, 2007 – with the agreed-upon price for a kilogram of cocaine – $25,370 – in his pocket, and committed himself to walking into the driveway of the residence. The court finds this evidence more than sufficient to prove beyond a reasonable doubt that Hancock took a substantial step toward committing the crime of possession with intent to distribute more than 500 grams of cocaine.[14] Accordingly, the court finds Hancock guilty on Count Two.

Dated: September 18, 2009

_____
CHIEF, UNITED STATES DISTRICT JUDGE

---

[14] Hancock argues that he made no substantial step to purchase the kilogram of cocaine, because he never offered anyone money for cocaine, never received any cocaine from anyone, and never spoke to Silva regarding a cocaine deal. (D.I. 96 at 11.) Hancock further argues that he was "merely present" at the agreed-upon meeting place with $25,370 in his pockets, but may have decided not to purchase the cocaine at the last minute. (Id. at 11-12.) The court finds these arguments without merit, as the only logical inference it can draw from the evidence adduced at trial is that Hancock was at 210 West 28th Street to purchase a kilogram of cocaine for distribution.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA, :

    Plaintiff,

:

v. : Criminal No. 07-60 GMS

DAVID HANCOCK and :
MIGUEL ALCANTARA,

    Defendants, :

**<u>ORDER</u>**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. The defendant, Hancock, is adjudged not guilty of the offense of conspiracy to possess with the intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine.

2. The defendant, Hancock, is adjudged guilty of the offense of attempted possession with the intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine.

Dated: September 14, 2009

CHIEF UNITED STATES DISTRICT JUDGE